**LOCAL 2578, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, Petitioner,**

v.

**GENERAL SERVICES ADMINISTRATION, Respondent.**

No. 82–1494.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1983.

Decided June 17, 1983.

Phillip R. Kete, student counsel, for petitioner. Janice M. Xaver, Washington, D.C., was on brief for petitioner. Daniel M. Schember, Washington, D.C., also entered an appearance for petitioner.

Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief for respondent. William Kanter, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondent.

Before EDWARDS, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by HARRY T. EDWARDS, Circuit Judge.

HARRY T. EDWARDS, Circuit Judge:

We are asked in this case to review an arbitrator's decision in an adverse action case arising under the Civil Service Reform

Act of 1978 ("CSRA" or "Act").[1] The underlying grievance arises out of the discharge of an employee at the General Services Administration ("GSA") for theft of government property. In upholding the agency's discharge action, the arbitrator ruled in effect that he was without authority to consider mitigation of the penalty. Instead, the arbitrator returned the petitioner's grievance to the GSA for it to give "due consideration" to the mitigating circumstances surrounding the employee's discharge.

The sole issue before this court is whether the arbitrator's deference to the employer was in accordance with law.[2] Because we hold that, absent some permissible contractual limitation, an arbitrator, like the Merit Systems Protection Board ("MSPB"), has independent authority to determine the appropriateness of penalties in adverse action cases, we reverse and remand to the arbitrator for further consideration in light of this opinion.

## I. BACKGROUND

### A. Factual Background

From 1979 until February 10, 1982, Joseph T. Moore was a WG-3 Laborer in the Administrative Services Division at the National Archives and Records Service ("NARS" or "Archives") of the GSA. Prior to the events giving rise to this case, Moore had an unblemished work record at the Archives. However, in October 1981, Moore voluntarily confessed to his supervisor that on several occasions he had assisted a fellow employee, Anthony Dailey, who had stolen cash contained in mail sent to the Archives. Moore's confession was apparently motivated by his religious beliefs and his serious conviction that he should seek to correct his past misdeeds.

Acting on his own initiative, and pursuant to conscience, Moore gave a complete, recorded statement on October 27, 1981, concerning the theft of government property. This confession was made in the presence of his second-line supervisor, a GSA investigator, and a Postal Inspector. Petitioner's Appendix ("App.") 10–20. Following his confession, Moore willingly cooperated with government officials in agreeing to wear a hidden recording device and to meet with Dailey in an effort to secure additional incriminating evidence.[3]

Moore's confession statement asserts that he never actually took any money himself. On one occasion he apparently kept money for Dailey and on another occasion he admittedly helped Dailey wash some stolen bills and exchange them at a liquor store. App. 14–16. Moore also acknowledged ripping up envelopes from which money had been stolen and flushing the envelopes down the toilet. App. 19. He claimed that he warned Dailey that the mail room where they worked appeared to be monitored by cameras, and he suggested that his only profit from Dailey's thefts was about $40.00 that Dailey gave him. App. 18–19.

Initially, no job action was taken by the GSA against Moore for his confessed involvement in Dailey's scheme. Subsequently, in a criminal proceeding, Moore pled guilty to theft of government property, a misdemeanor.[4] On December 16, 1981, he was sentenced to one year's probation. On the same day, he received notice of the GSA's intention to fire him because of this conviction. Shortly thereafter, the Postal Inspector who had previously questioned

1. Pub.L. No. 95–454, 92 Stat. 1111 (1978) (codified as amended in scattered sections of 5 U.S.C. (Supp. V 1981)).

2. 5 U.S.C. § 7703(c) (Supp. V 1981). Section 121(f) of the CSRA provides that an arbitral decision under a negotiated grievance procedure concerning the dismissal of a federal employee pursuant to sections 7512 (adverse actions) and 4303 (actions based on unacceptable performance) is subject to judicial review ac-

cording to 5 U.S.C. § 7703 in the same manner as a final decision of the Merit Systems Protection Board. 5 U.S.C. § 7121(f) (Supp. V 1981).

3. This meeting took place later on the same day. A transcript of the meeting is reprinted at App. 21–28.

4. 18 U.S.C. § 641 (1976).

him sent a letter to the Archives commending Moore for his cooperation. Additionally, Moore's Probation Officer requested that Moore be permitted to retain his employment. Finally, the Chief Shop Steward of Local 2578 of the American Federation of Government Employees ("AFGE") suggested that Moore's penalty be reduced to a letter of reprimand because of his cooperation with law enforcement officials. However, the GSA confirmed Moore's removal from the Federal Service. The termination letter stated, "[e]ven considering your participation in the investigation and other circumstances, the seriousness of your offense demands that your services with this agency be terminated. Your conviction for this offense creates a serious problem of trust in any position in this agency." [5]

## B. *The Arbitration Proceedings*

Local 2578 commenced grievance proceedings on Moore's behalf pursuant to the NARS Negotiated Grievance Procedure. The Union requested that Moore be reinstated with back pay or that the removal be reduced to a lesser penalty. When the matter was not settled, the grievance was appealed to arbitration under Article 9, Section 5 of the Union-Management Agreement[6] in accordance with section 7121(b)(3)(C) of the CSRA.[7] After a hearing and briefing, the arbitrator held that theft normally constitutes just cause for discharge, and that the severity of the penalty was within the discretion of the employing agency.[8] The arbitrator noted that the GSA appeared to have "totally disregarded" the Probation Officer's request and thus ordered the GSA to reconsider its decision. He stated that if the GSA were to adhere to its decision that Moore should be discharged, "the Arbitrator will not find that the Agency [GSA] violated the contractual standard."[9] The GSA adhered to its dismissal decision. This petition for review followed. This court has jurisdiction pursuant to 5 U.S.C. §§ 7121(f) and 7703(c) (Supp. V 1981).

## II. DISCUSSION

AFGE's argument that the arbitrator erred in deferring to the employing agency concerning mitigation of Moore's penalty proceeds in two stages. The Union observes, first, that, under the CSRA, arbitral and Merit Systems Protection Board decisions concerning adverse actions are governed by the same standards. Since the MSPB is empowered independently to assess the severity of penalties imposed by employing agencies, the argument continues, arbitrators must, of necessity, possess this same power to mitigate penalties. The GSA, relying on *Gipson v. Veterans Administration,* 682 F.2d 1004 (D.C.Cir.1982), responds that this court may not substitute its judgment for that of the employing agency unless the penalty is so excessive as to constitute an abuse of discretion.

---

5. Letter from Richard A. Jacobs, Assistant Archivist, General Services Administration to Joseph T. Moore (Jan. 25, 1982), *reprinted in* App. 34–35.

6. *Id.* at 35. This reference to the Union-Management Agreement is found in the termination letter. Since the collective bargaining agreement is not a part of the record, we cannot verify the accuracy of the contractual citation.

7. Section 7121(b)(3)(C) provides for binding arbitration of "any grievance not satisfactorily settled under the negotiated grievance procedure . . . ." 5 U.S.C. § 7121(b)(3)(C) (Supp. V 1981).

8. The arbitrator, Seymour Strongin, stated that "[s]uggestions that the erring employee should be dealt with more leniently are, in the ordinary case, more properly addressed to the employer than to the Arbitrator, whose sole function is to determine whether the offence constitutes 'just cause.' . . . [A]ll . . . [mitigating] elements [are] to be weighed by the employer in determining to discharge grievant or to join in the efforts at his rehabilitation." Arbitrator's Decision 4–5, *reprinted in* App. 1, 4–5.

9. *Id.* at 7. The arbitrator's reference to a "contractual standard" is unclear and remained unelucidated by counsel at oral argument. No contract is to be found in the record. Thus, we assume that the standard for dismissal in Moore's case is that which governs removal of federal employees in adverse actions: an employee may be removed "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a) (Supp. V 1981).

Initially, we should make clear our view that nothing in the CSRA requires that arbitration and MSPB actions always adhere to the same standards and procedures, or produce the same results in like cases. However, we agree with AFGE that, in this case, the arbitrator's complete failure independently to consider the severity of the penalty imposed on Moore requires that this matter be remanded for such consideration. The GSA's argument to the contrary is unavailing because it incorrectly assumes that the agency's discharge sanction received adequate review by the arbitrator. Because no independent consideration of mitigating factors has occurred here, *Gipson* is inapposite. In *Gipson*, this court found that the MSPB had considered mitigating factors independently of the employing agency. 682 F.2d at 1012 n. 15. Thus, our review was limited to whether the MSPB abused its discretion in its consideration of these factors.

### A. The Statutory Framework

The CSRA establishes a comprehensive system for review of personnel hiring, promotion and dismissal decisions in the federal sector. In adverse action discharges under section 7512,[10] the CSRA permits recourse by an aggrieved employee either to the MSPB, or, if a collective bargaining agreement exists, pursuant to a contractual grievance and arbitration procedure.[11] 5 U.S.C. § 7121(e)(1) (Supp. V 1981). Because Moore chose to appeal the GSA's decision to fire him under the Union-Management Agreement, we deal here with an appeal from an arbitral judgment.

In *Devine v. White,* 697 F.2d 421 (D.C.Cir. 1983), we recently examined at length the standard of review applicable to arbitration decisions under the CSRA. The court there noted:

> Appeals *by aggrieved employees* from decisions of arbitrators or the MSPB in adverse action cases are governed by section 7703(c), which requires the court to set aside any actions, findings, or conclusions to be found
>
> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) obtained without procedures required by law, rule, or regulation having been followed; or
>
> (3) unsupported by substantial evidence.

*Id.* at 439 (emphasis in original; footnote omitted). In applying the same standard of review to both MSPB and arbitration decisions, Congress sought to promote some uniformity of process and to ensure that the statutory procedures adequately protect the rights of government employees.[12] However, the principal point made in *Devine v. White* is that, under the CSRA (as in the private sector), the Act "leaves arbitrators' interpretations of collective bargaining agreements themselves largely unreviewable." *Id.* at 440. The court in *Devine v. White* thus concluded that:

> Only if the court determines that the arbitrator erred as a matter of law in interpreting a civil service law, rule, or regulation can it upset his decision—a standard of review that is at least as deferential as the standard governing review of arbitral decisions in the private sector.

10. 5 U.S.C. § 7512 (Supp. V 1981).

11. This choice also extends to employees who are suspended for more than 14 days, receive grade or pay reductions, or furloughs of 30 days or less. 5 U.S.C. §§ 7121(e)(1), 7512 (Supp. V 1981). Employees subject to removals or demotions for unacceptable performance may also use either procedure. 5 U.S.C. §§ 4303, 7512 (Supp. V 1981).

Under the CSRA, all negotiated grievance procedures must provide for binding arbitration:

> Any negotiated grievance procedure ... shall ... provide that any grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration which may be invoked by either the exclusive representative or the agency.

5 U.S.C. § 7121(b)(3) (Supp. V 1981).

12. *Devine v. White,* 697 F.2d at 428, 440 (discussing relevant legislative history of the CSRA).

We conclude, therefore, that (1) the policies favoring extremely limited judicial review of arbitrators' decisions are fully applicable in the federal sector; (2) Congress recognized the advantages of arbitration, but effected a limited departure from the private sector's tradition of deference to ensure that arbitrators' decisions, like the decisions of the MSPB, adequately protect federal employees' rights....

*Id.* (footnotes omitted). With this limited scope of review in mind, we turn to the merits of petitioner's claim.

**B.** *The Arbitrator's Failure to Consider Mitigation*

■ The principal problem in this case—at least insofar as judicial review is concerned—is not the arbitrator's decision [13] but the manner in which it was reached. In ruling that his "*sole* function [was] to determine whether the offence constitute[d] 'just cause'," App. 5 (emphasis added), and that questions of mitigation were "more properly addressed to the employer," App. 4, the arbitrator abdicated his responsibility to fully consider Moore's grievance. We reach this conclusion in light of our holding that an arbitrator hearing a case under the CSRA must consider issues of mitigation unless the parties' contract lawfully provides otherwise. Since the arbitrator in this case failed to comply with this rule, his decision must be overturned. In other words, "[a] wholesale and unexplained failure to apply ... rules governing the arbitration process ... 'manifest[s] an infidelity' to the arbitrator's defining obligations ... justify[ing] [judicial] review." *Devine v. White,* 697 F.2d at 446 (Lumbard, J., concurring).

■ As we have already indicated, Congress intended that there be some symmetry between the arbitration and MSPB processes in order "[t]o promote consistency and to discourage forum shopping." *Devine v. White,* 697 F.2d at 428. The inequi-

ty of an arbitrator having less authority than the MSPB to deal with the same adverse action is self-evident; an aggrieved employee would be likely to choose the forum providing the greatest independent review of an adverse decision. Even a cursory evaluation of the statute makes it plain that the CSRA sets arbitration on a par with administrative review before the MSPB. Therefore, we conclude that, absent some permissible contractual limitation, arbitrators must have the same inherent authority as the MSPB to mitigate employer-imposed penalties. For these reasons, and those outlined below, we hold that the arbitrator in this case erred as a matter of law in declining to consider the issue of mitigation.

**1.** *The MSPB's Independent Authority to Mitigate*

The MSPB clearly has independent authority to consider whether a penalty chosen by an employing agency is appropriate for the specific misconduct involved. *Parsons v. United States Department of the Air Force,* 707 F.2d 1406 (D.C.Cir.1983); *Douglas v. Veterans Administration,* 5 M.S.P.B. 313 (1981). *Douglas* ably traces both the historical and practical bases of this authority, noting that the Civil Service Commission ("Commission"), the predecessor of the MSPB, was authorized to weigh the severity of penalties imposed by employing agencies. *See Douglas,* 5 M.S.P.B. at 319–23. In enacting the CSRA, Congress plainly intended to vest the MSPB with the same authority previously exercised by the Commission to consider issues of mitigation. *Id.* at 319–21.

In elaborating on this point, the court in *Parsons v. United States Department of the Air Force* held:

In an agency removal action based on employee misconduct, the agency must make three determinations: (1) that the employee actually committed the alleged misconduct; (2) that there is a sufficient nexus between the misconduct and the

**13.** *Cf. W.R. Grace & Co. v. Local 759,* —— U.S. ——, ——, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983) ("Under well established standards for the review of labor arbitration awards, a

federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one.").

efficiency of the service to sustain an adverse action; and (3) that the penalty imposed has been appropriately chosen for the specific misconduct involved.... The agency has the burden of persuasion regarding these three elements of its decision and is therefore obligated to present evidence to the Board necessary to support each element.

. . . .

[T]he selection of an appropriate penalty is a distinct element of an agency's decision. The agency therefore has the ultimate burden of persuading the MSPB of the appropriateness of the penalty imposed .... This is necessary even if ... the penalized employee has not raised a question as to the appropriateness of the imposed sanction.

At 1409, 1410 (footnotes and citations omitted).

Additionally, as a practical matter, if the MSPB were required to remand cases involving excessive penalties to the employing agency for reconsideration, the result would be a potentially endless series of remands and appeals until the MSPB found that the employing agency had chosen the appropriate penalty. *See Douglas,* 5 M.S.P.B. at 323. This result would clearly run contrary to Congress' express desire for a system that provides for expeditious processing of adverse action cases.

### 2. *Private Sector Arbitration*

We find further support for the arbitrator's mitigation authority when we examine the traditional role of arbitrators in private sector discipline and discharge cases.[14] In private arbitral proceedings, if the collective bargaining agreement provides for grievance and arbitration of discharges or other employer-imposed penalties, the arbitrator's authority to consider the appropriateness of these penalties is well-estab-

lished.[15] So central is this authority that even if a collective bargaining agreement fails specifically to authorize an arbitrator to modify improper penalties, the power "may be deemed inherent in his power to decide the sufficiency of cause" for discharge.[16] Under an agreement requiring just cause for dismissal, arbitrators will frequently, at a minimum, review the penalty to assure that it is not "unreasonable, capricious or arbitrary action." [17]

We do not mean to suggest that arbitrators in the federal sector must adhere precisely to arbitral practices or decisions in the private sector concerning mitigation of penalties. Rather, we look to the private sector to determine only that, absent contractual provisions to the contrary, the authority to mitigate traditionally has been viewed as inherent in the arbitral function. Given this firm tradition, and in light of the fact that the MSPB, too, retains the clear authority to reduce disciplinary penalties in adverse action cases pursuant to principles of mitigation, we can imagine no less authority for arbitrators hearing cases under the CSRA.

### 3. *The Standard of Judicial Review*

Finally, the importance of arbitral and MSPB authority to consider the appropriateness of penalties is reinforced by the highly deferential standard of judicial review of arbitral and MSPB decisions. As noted above, the decision in *Devine v. White* emphasized the desirability of limited judicial review of arbitral decisions. While courts must oversee uniform and correct application of applicable statutes and regulations in both MSPB and arbitral proceedings, the *Devine* court noted that, generally, one of the advantages of arbitration over litigation in personnel cases is the traditional judicial deference to arbitration. 697 F.2d at 435. The court reaffirmed that

---

14. In *Devine v. White* the court pointed out that, because the terms of the CSRA are fraught with ambiguity, we must "look to the common law of labor arbitration to divine statutory meaning." 697 F.2d at 425.

15. *See* F. ELKOURI & E. ELKOURI, HOW ARBITRATION WORKS 624–32 (3d ed. 1973) [hereinafter cited as HOW ARBITRATION WORKS]. *See also* R. GOR-

MAN, BASIC TEXT ON LABOR LAW 588–92 (1976) [hereinafter cited as LABOR LAW].

16. HOW ARBITRATION WORKS, *supra* note 15, at 628. *See* LABOR LAW, *supra* note 15, at 591.

17. HOW ARBITRATION WORKS, *supra* note 15, at 625 & 625–26 n. 75.

deference in the federal sector, *id.* at 435–40,[18] noting that

> [i]f arbitration becomes simply another level of decisionmaking, subject to judicial review on the merits, arbitrators may begin to decide cases and write opinions in such a way as to insulate their awards against judicial reversal—producing opinions that parrot the appropriate statutory standards in conclusory terms, but suffer from lack of reasoned analysis. Such a shift from the arbitral model … would substantially undercut the ability of arbitrators successfully to resolve disputes arising out of the employment relationship.

*Id.* at 436.

For judicial deference to arbitral decisions to have meaningful application, the reviewing court must be confident that the arbitrator has undertaken a thorough review of each aspect of an adverse action. Accordingly, arbitrators, just like the MSPB, must review all aspects of an employer's adverse action decision in order for the court to defer to the process with confidence.

One exception to this holding is arguably mandated by the statute itself. Under 5 U.S.C. § 7121(a)(2) (Supp. V 1981), contracting parties presumably are free to limit the arbitrator's authority by agreement. In the present petition for review, however, neither party has argued that the collective bargaining agreement pursuant to which AFGE brought this matter to arbitration limited the arbitrator's authority to consider mitigating factors. When the parties have not lawfully removed this mitigation authority from the arbitrator, he must decide issues relating to the appropriateness of the penalty.[19]

### III. Conclusion

Because the arbitrator in this case failed entirely even to consider the question of mitigation, we remand the case for further consideration. On remand, the arbitrator must evaluate the effect of Moore's voluntary confession, his cooperation with government authorities, the parole officer's recommendation, and of any other factors relevant to the appropriateness of the GSA's penalty of dismissal. We emphasize that we do not suggest what the arbitrator's judgment should be; our only concern in this case is that the arbitrator did not exercise any judgment with respect to mitigation.

The case is hereby remanded to the arbitrator for further proceedings as may be necessary to consider mitigation. The arbitrator's fee and related costs shall be paid in the same manner and on the same terms as was done pursuant to the initial arbitration hearing.

*So ordered.*

---

18. We emphasized that Congress departed from the private sector tradition of deference "in a manner that leaves arbitrators' interpretation of collective bargaining agreements themselves largely unreviewable." 697 F.2d at 440. In this case, interpretation of a collective bargaining agreement is not, however, an issue.

19. Because the issue is not before us, we need not decide the extent to which the parties may limit arbitral authority to mitigate employer-imposed penalties.