George W. YARBROUGH, Jr., Petitioner,

v.

OFFICE OF PERSONNEL MANAGEMENT, Respondent.

Appeal No. 84–1341.

United States Court of Appeals, Federal Circuit.

Aug. 26, 1985.

---

Amy E. Wind, Kator, Scott & Heller, of Washington, D.C., argued for petitioner. With her on the brief was Irving Kator.

Helene M. Goldberg, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for respondent. With her on the brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Robert A. Reutershan.

Earl A. Sanders, Office of the General Counsel, Office of Personnel Management, of Washington, D.C., of counsel.

Before FRIEDMAN, BALDWIN, and BISSELL, Circuit Judges.

BALDWIN, Circuit Judge.

This appeal is from the decision of the Merit Systems Protection Board (MSPB or board), sustaining the Office of Personnel Management's (OPM) decision that Dorothy Yarbrough was not eligible for discontinued service retirement on the basis of involuntary separation. We affirm.

### Background

Petitioner, George W. Yarbrough, Jr., who is the stepson and executor of the deceased former federal employee for the National Security Agency (NSA), Dorothy Yarbrough, filed an application with OPM for a retroactive retirement annuity for his stepmother. He contended that OPM should pay Mrs. Yarbrough's estate a sum equal to the amount Mrs. Yarbrough would have received as an annuity from the time of her separation from federal service in January of 1969, until her death in June of 1982, less the refund of retirement deductions she applied for and received from the Civil Service Commission (OPM's predecessor) in March 1971.

Mrs. Yarbrough worked as a cryptanalyst for NSA for over 25 years. Her performance was entirely satisfactory and she received very favorable ratings from her supervisors. In March 1968 her father died and so she went on leave. She requested and was granted leave without pay (LWOP) until June 28, 1968. Three further extensions of LWOP were requested by Mrs. Yarbrough and granted by NSA, extending her LWOP through December 31, 1968. Her supervisor granted the third extension on the condition that there would be no further extensions and that if Mrs. Yarbrough could not report to duty on January 2, 1969, she would "submit her resignation ... in sufficient time so that she will not be considered Absent Without Leave." On November 22, 1968, before the final extension of LWOP expired, her supervisor wrote a letter informing her that after January 1, 1969, the division of NSA in which she worked was expected to relocate near the Baltimore airport—about ten miles further from her home than the present facility. He said this information may be useful to her "in reaching [her] decision which will be coming up soon." On January 6, 1969, Mrs. Yarbrough sub-

mitted to NSA a letter of resignation, the body of which read:

> I regret that I was not able to return to duty at N.S.A. on 2 Jan. '69, due to the fact that I have had the flu. I informed my supervisor, Mr. James Hudson B 4303, that it would be impossible to return on that date. He replied that no more L.W.O.P. could be extended. Therefore I request that you accept my resignation from N.S.A.
>
> I would appreciate some information on my Govt. Ins. Policy and also Health Ins.

Approximately one month later, upon petition of one of her sisters-in-law, Mrs. Yarbrough was committed to a state hospital for treatment of inebriety. It appears that Mrs. Yarbrough was released from the hospital either on February 17, 1969 or perhaps sometime in March 1969.

The next relevant item is a March 4, 1970 letter from NSA's Personnel Officer informing Mrs. Yarbrough that she could obtain the insurance information she desired by writing to the Civil Service Commission. On April 14, she wrote the Commission asking when and how she would be eligible for retirement payments and how much she had paid into the retirement fund. On May 19, 1970, the Commission replied that she would be entitled to a deferred annuity beginning at age 62 and that in the alternative she could choose to withdraw her retirement contributions and receive a refund of $10,757.03 plus interest.

The Commission's letter described the advantages and disadvantages of the two available courses of action. Some ten months later, Mrs. Yarbrough filed an application for refund of her contributions. On March 26, 1971, the money credited to her retirement account was refunded to her with interest. Mrs. Yarbrough died on June 11, 1982.

Petitioner, as executor of Mrs. Yarbrough's estate, applied to OPM for civil service annuity benefits for the period between her separation from federal service and her death. Petitioner asserts that Mrs. Yarbrough's resignation from NSA was "involuntary" within the meaning of 5 U.S.C. § 8336(d)(1) [1] and that she was entitled to an annuity under that provision commencing on the day after the date of her separation. OPM denied the application on the ground that no benefits were payable because Mrs. Yarbrough had elected to receive a refund of her contributions to the retirement fund. Appeal to the MSPB followed.

In an initial decision, the board's presiding official upheld the OPM decision, determining that Mrs. Yarbrough was not eligible for an annuity because her resignation was not an involuntary separation and her election of a refund voided any annuity rights. The presiding official looked to the definition of "involuntary separation" contained in Federal Personnel Manual (FPM) Supplement 831–1, Subch. S11–2a [2] for pur-

---

1. 5 U.S.C. § 8336(d)(1) provides in relevant part:

   (d) An employee who—
   (1) is separated from the service involuntarily, except by removal for cause on charges of misconduct or delinquency ...
   ....
   after completing 25 years of service or after becoming 50 years of age and completing 20 years of service is entitled to an annuity.

2. The relevant edition appears to be the one dated October 28, 1966. The May 11, 1964 edition quoted by the presiding official contains substantially identical language for the relevant portions. Subchapter S11–2a (Oct. 28, 1966) provides:

   a. Definition of term. The term *involuntary separation* means any separation against the will and without the consent of the em-

ployee, other than separation for cause on charges of misconduct or delinquency. Examples are: Reduction in force; abolishment of position; lack of funds; expiration of term of office; liquidation of an office or an entire agency; inefficiency (unless due to the employee's misconduct); disability (provided the separation action is initiated by the agency); separation during probation because of failure to qualify; or separation of an indefinite or temporary employee under the Commission's instructions for displacement (section 316.501 of the regulations). Note, however, that whether a separation is involuntary depends upon all the facts in a particular case; it is the true substance of the action which governs rather than the methods followed or the terminology used. The responsibility for determining whether a separation is involun-

poses of retirement eligibility under 5 U.S.C. § 8336(d)(1), and determined that Mrs. Yarbrough was not separated for any of the reasons listed but rather:

Mrs. Yarbrough resigned because NSA would not extend her LWOP any further and she decided not to take either of the other two options then available to her: reporting for duty despite illness, or remaining off duty and risking being charged absent without leave.

As to the circumstances surrounding Mrs. Yarbrough's election of a lump-sum refund of her retirement contributions in 1970, the presiding official noted that she never filed a claim for a civil service annuity and found no evidence that Mrs. Yarbrough was incompetent when she filed for the refund.

The presiding official's initial decision became a final decision of the board on April 6, 1984 and appeal to this court followed. Petitioner argues before us that the board erred in defining "involuntary separation" and in applying the proper definition to the facts. Petitioner contends that the agency effected an involuntary separation by improperly conditioning its grant of Mrs. Yarbrough's third extension of LWOP and then by enforcing that condition. The government contends that this court lacks jurisdiction under *Gilman v. OPM,* 743 F.2d 881 (Fed.Cir.1984).

### OPINION

*Jurisdiction*

The Supreme Court in *Lindahl v. Office of Personnel Management,* —— U.S. ——, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985), held that 28 U.S.C. § 1295(a)(9) and 5 U.S.C. § 7703(b)(1) provide exclusive jurisdiction in this court over appeals from certain MSPB retirement decisions. *Id.* at 1634–35. We draw from *Lindahl* that, excluding cases involving discrimination, our jurisdiction embraces appeals from MSPB decisions whose jurisdiction is founded upon 5 U.S.C. § 8347(d). In the present case, the MSPB properly exercised jurisdiction pursuant to 5 U.S.C. § 8347(d)(1). Accordingly, section 7703(b)(1) confers jurisdiction on this court to review the board decision.

*Involuntary Separation*

"Involuntary separation" under 5 U.S.C. § 8336(d)(1), as administratively defined in subchapter S11–2a of FPM Supplement 831–1, is an issue which "depends upon all the facts in a particular case" and is governed by the true substance of the action rather than the methods followed or the terminology used.

■ Pursuant to our standard of review under 5 U.S.C. § 7703(c), we hold that the board's finding of no involuntary separation is supported by substantial evidence and that the board committed no legal error.

The board properly looked to all the relevant facts of record in making its determination. The records documenting Mrs. Yarbrough's initial request for and grant of LWOP and the three further extensions of LWOP (covering 9 months) demonstrate a reasonable and even charitable approach by NSA in accommodating Mrs. Yarbrough. The third extension of LWOP was granted on the condition that Mrs. Yarbrough either return to work or resign at the end of that LWOP period (December 31, 1968) and avoid being absent without leave (AWOL). Mrs. Yarbrough's January 6, 1969 letter gives no indication that she did not mean to resign. The letter requests the director of NSA to accept her resignation and also requests information on her government insurance policy and health insurance. Nor is there anything in her conduct after January 6 suggesting involuntariness of resignation. Indeed, she made a further request for information on retirement payments and contributions and then submitted an application for a lump-sum refund of her retirement contributions.

Petitioner argues that Mrs. Yarbrough's superior improperly conditioned the third extension of LWOP, and that enforcing the condition constituted an involuntary sepa-

tary for retirement purposes rests with the Commission.

ration. In support, petitioner cites our decision in *Covington v. Department of Health and Human Services*, 750 F.2d 937 (Fed.Cir.1984), contending that NSA failed (when conditionally granting her third extension) to inform her of her options and her right to an annuity if she resigned. At oral argument petitioner even contended that NSA was required to advise Mrs. Yarbrough that if she did not report to work or resign at the end of the extension she would be fired for being AWOL. These contentions are not well taken.

In *Covington*, this court held that a retirement was involuntary where the agency had misled the employee with erroneous information contained in a notice of reduction-in-force (which stated that the agency was going to be abolished and that Covington had no right of reassignment) and had described the nature of the personnel action in an SF 50 form as being an "involuntary retirement." That is not the case here. There is nothing in the record indicating that NSA misled Mrs. Yarbrough in any respect. On the contrary, the conditional grant of the third extension gave her *legitimate* choices at the expiration of the extension: return to work, resign, or risk being AWOL. She chose to resign. Moreover, these same three choices were implicitly available when NSA offered her the conditional extension of LWOP. She chose to accept the offer. NSA's grant of the third extension of LWOP, conditioned with legitimate choices, was entirely reasonable when one considers the extended period of Mrs. Yarbrough's absence from her job. *Cf. Corrigan v. United States*, 153 Ct.Cl.

392 (1961) (four months of LWOP allowed, five additional months not allowed).

Petitioner also appears to argue that Mrs. Yarbrough could not competently elect to receive the lump-sum refund of her retirement contributions. OPM argues that under the Civil Service Retirement Act, Mrs. Yarbrough was never an "annuitant" [3] because she never filed a claim for an annuity but instead filed a claim for and received her civil service retirement deductions. OPM says, citing 5 U.S.C. § 8342(a),[4] that when Mrs. Yarbrough received her lump-sum credit of retirement deductions, all annuity rights were thereby voided.

■ The board found no evidence that Mrs. Yarbrough was incompetent when she filed the refund application and concluded that her annuity rights were extinguished when she received her refund. We agree.

The record contains substantial evidence to support the underlying findings of the board. Although it was agreed that Mrs. Yarbrough was "distraught and alcoholic at the time," the board considered for example the overall tenor of her January 6, 1969 letter, her April 14, 1970 letter to the Civil Service Commission asking about her eligibility for retirement payments and amount she had paid into the retirement fund, the Commission's May 19, 1970 reply detailing her alternatives of an annuity or a lump-sum refund, and finally her filing of an application for refund of retirement deductions. On the face of the application the following was displayed: "If you have more than 5 years of service you may be entitled to annuity rights which will be forfeited by payment of this refund unless

---

**3.** 5 U.S.C. § 8331(9) (1982) (emphasis added) provides:

"annuitant" means a former employee or Member who, on the basis of his service, meets all requirements of this subchapter for title to annuity *and files claim therefor....*

**4.** 5 U.S.C. § 8342(a) (1982) (emphasis added) provides:

An employee or Member who is separated from the service, or is transferred to a position in which he does not continue subject to this subchapter, is entitled to be paid the lump-sum credit if his separation or transfer

occurs and application for payment is filed with the Office of Personnel Management at least 31 days before the earliest commencing date of any annuity for which he is eligible. *The receipt of payment of the lump-sum credit by the individual voids all annuity rights under this subchapter,* until he is reemployed in the service subject to this subchapter. This subsection also applies to an employee or Member separated before October 1, 1956, after completing at least 20 years of civilian service.

you are later reemployed." In addition, the board noted that, although Mrs. Yarbrough had been admitted to a state hospital in February 1969 and released later in that month or in March, no guardian was ever appointed for her and she was not formally adjudicated incompetent.

In conjunction with the finding of no evidence that Mrs. Yarbrough was incompetent to make her own choices, the board correctly concluded that section 8342(a) bars any right in this case to an annuity under section 8336(d). Mrs. Yarbrough received a lump-sum payment of her retirement contributions and never was reemployed in the civil service after her resignation.

### Conclusion

Having sustained the board's findings that Mrs. Yarbrough's resignation was not an involuntary separation and that she elected to receive a lump-sum refund of her retirement contributions, the board's decision upholding OPM's denial of a retirement annuity must be *affirmed.*

AFFIRMED.